**Entered on Docket**
**December 29, 2017**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**Signed and Filed: December 29, 2017**

**HANNAH L. BLUMENSTIEL**
**U.S. Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | ) Case No. 16-50543 HLB |
| ROBERT W. PAYNE and EILEEN P. TREMAIN, | ) Chapter 13 |
| Debtors. | ) |

**MEMORANDUM DECISION**

This case came before the court on August 1, 2017 for trial on an objection to confirmation filed by creditors LaRiviere Grubman & Payne LLP ("LGP") and Mr. F. David LaRiviere (Dkt. 12, the "Objection"). Prior to trial, the court limited the issues to be tried to those grounded in sections 1325(a)(3) and (a)(7)[1] namely, whether the joint debtors: (1) proposed their plan in good faith and not by any means forbidden by law; and (2) filed their petition in good faith.

For the reasons that follow, the court finds that joint debtors Eileen P. Tremain and Robert W. Payne did not file their petition in good faith because they failed to engage in reasonable efforts to ensure the accuracy of their schedules

[1] Unless otherwise indicated, all statutory citations shall refer to Title 11 of the United States Code, aka the Bankruptcy Code, and all citations to rules shall refer to the Federal Rules of Bankruptcy Procedure.

and either deliberately omitted debts owed to LGP, LG, and/or Mr. LaRiviere, or remained willfully ignorant as to the existence and/or the amounts of such debts. The court declines to find that Mr. Payne and Ms. Tremain proposed their plan in bad faith, principally because they have amended the plan to cure the deficiencies to which LGP and Mr. LaRiviere point as evidence that they did not propose it in good faith. Accordingly, the court **SUSTAINS IN PART AND OVERRULES IN PART** Mr. LaRiviere's and LGP's Objection.

**A. Jurisdiction**

This contested matter constitutes a core proceeding in which the court may enter a final order. 28 U.S.C. §157(b)(2)(L); Northern District of California General Order No. 24. This memorandum decision constitutes the findings of fact and conclusions of law required by Rules 7052 and 9014(c).

**B. Findings of Fact.**

For more than 20 years, Mr. Payne and Mr. LaRiviere practiced law as partners in LGP. They do not dispute that Mr. Payne held a 45% interest in that partnership, while Mr. LaRiviere held a 55% interest. In September 2014, Mr. Payne withdrew from the partnership. Pursuant to section 5.3 of LGP's articles of incorporation (as amended), Mr. Payne's withdrawal resulted in LGP's dissolution or termination, and required that the partnership be "wound down in accordance with the general law regarding partnerships in California." [Debtors' Ex. A, § 5.3.1.]

Mr. Payne's departure left Mr. LaRiviere responsible for LGP's wind-down, which involved, among other things, collecting

LGP's accounts receivable and administering LGP's 40% interest in Justin Court LP ("JCLP"), an entity in which LGP also served as general partner. In addition to managing LGP's wind-down, Mr. LaRiviere had to earn a living, so he quickly formed a new firm: LaRiviere & Grubman, P.C. ("LG").

JCLP owned commercial real property located at 19 Upper Ragsdale Drive, Suite 200, Monterey, California (the "Property"). JCLP acquired the Property with two loans, each of which were secured by the Property and guaranteed by Mr. Payne and Mr. LaRiviere. [Creditors' Exs. 28-30.]

LGP was JCLP's tenant pursuant to a lease originally dated August 28, 2003.[2] After Mr. Payne withdrew from LGP, he and Mr. LaRiviere agreed that LGP would remain liable for any unpaid rent through September 15, 2014 and that thereafter, LG would become liable for rent on 40% of the space previously occupied by LGP. [Debtors' Ex. C.] They also agreed that LG would take over for LGP as JCLP's general partner. [Id.] The court received no evidence as to whether the parties reduced any of these details to formal, written agreements.

After Mr. Payne withdrew from LGP, it fell entirely to Mr. LaRiviere[3] to make sure JCLP remained current on payments to its secured lenders. According to Mr. LaRiviere, this became increasingly difficult because the rent paid by LG was

---

[2] The lease's original term ended December 31, 2009. It provided, however, for two, five-year renewal options, one of which appears to have been exercised, given that LGP continued to occupy the Property until it dissolved due to Mr. Payne's departure.

[3] As the one left in charge of LGP, JCLP's original general partner, and as the apparent manager of LG, JCLP's successor general partner



Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 3 of 22

insufficient to cover the monthly payments owed to the lenders whose claims were secured by the Property and guaranteed by Messrs. Payne and LaRiviere.

In December 2014, Mr. LaRiviere sent Mr. Payne a letter advising that "a substantial shortfall has developed between the monthly amount due on the loans on the building and the amount payable as monthly rent." [Creditors' Ex. 18.] Mr. LaRiviere further advised that, in order to preserve LG's and LGP's "reputation and credit worthiness," to preserve the value of the Property, and to avoid triggering liability on the guarantees, he had personally covered the shortfall from the time of Mr. Payne's departure through December 31, 2014, to the tune of nearly $22,000. [Id.] Mr. LaRiviere asked Mr. Payne to reimburse him for half that amount, plus half of the amount necessary to cover the shortfall that would accrue in January 2015, stating: "I cannot continue to sustain these expenses alone." [Id.]

Among LGP's other obligations was a $400,000 line of credit with Rabobank N.A., which was secured by LGP's inventory, accounts, equipment, and general intangibles (the "Rabobank LOC"). [Creditors' Exs. 14 and 15.] Messrs. Payne and LaRiviere jointly and severally guaranteed repayment of the Rabobank LOC.[4] [Creditors' Ex. 14, as to Mr. Payne's guaranty.] As of November 19, 2013, the outstanding principal balance on the Rabobank LOC totaled $40,000. [Creditors' Ex. 14.] By the time Mr. Payne withdrew from LGP, the amount due

[4] Mr. Payne's and Mr. LaRiviere's guarantees were unsecured. [Creditors' Exs. 14 and 15.]


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 4 of 22

on the Rabobank LOC totaled $312,934. [Creditors' Ex. 31.] On February 26, 2016, when Mr. Payne and Ms. Tremain filed their petition for relief under Chapter 13, the total amount due on the Rabobank LOC was $288,366.01. [Creditors' Ex. 15.]

By the time Mr. Payne withdrew from LGP, the firm was not profitable and was "in a bunch of trouble," unable even to generate revenue sufficient to make payroll, which Mr. LaRiviere was covering out of his own pocket. LGP also had stopped paying the full amount of its rent to JCLP, and here again, Mr. LaRiviere stepped in to cover any shortfall to the extent he was able.

Collection of LGP's accounts receivable proved difficult, particularly given that sole responsibility for that task fell to Mr. LaRiviere. Any collections went to pay LGP's debts, but these were insufficient to fully satisfy LGP's obligations, not the least of which was the Rabobank LOC, on which LGP defaulted. This led Rabobank to pursue Messrs. Payne and LaRiviere on account of their guarantees.

In January 2016, however, JCLP sold the Property. According to the Seller's Settlement Statement [Debtors' Ex. D], JCLP received $435,680.35 in net proceeds. Of this, LGP was entitled to receive $201,074.[5] [Creditors' Ex. 31.] $100,000 of LGP's net sale proceeds, however, was paid to Rabobank out of escrow, which reduced the balance due on the

[5] Without explanation, Mr. LaRiviere testified that LGP received net sale proceeds of approximately $175,000. This is refuted by a memorandum prepared by LGP's accountant, which confirms the rough accounting set forth above. [Creditors' Ex. 31.] The court finds the accountant's memorandum more credible than Mr. LaRiviere's testimony on this point.

Rabobank LOC to approximately $212,934. [Id.] The remaining $101,074 was paid to Mr. LaRiviere. [Id.] The rationale for this is explained in Creditors' Exhibit 31 (a January 13, 2017 memorandum from LGP's accountant).

Exhibit 31 for the most part confirms Mr. LaRiviere's testimony that, from the time of Mr. Payne's departure through the sale of the Property, he made sure that JCLP remained current on the debts secured by the Property, as well as on taxes and utility payments. His efforts preserved the value of the Property and avoided triggering his and Mr. Payne's liability under their guarantees of the debts secured by the Property. Exhibit 31 also confirms that collection of LGP's accounts receivable proved inadequate to satisfy its outstanding obligations and that Mr. LaRiviere stepped in and covered those obligations himself. According to LGP's accountant, this justified the transfer to Mr. LaRiviere of all remaining net proceeds due to LGP from the sale of the Property. Exhibit 31 also confirms that, once he withdrew from LGP, Mr. Payne contributed next to nothing toward LGP's expenses.

Out of what he received from LGP's share of the net proceeds from the sale of the Property, Mr. LaRiviere held back approximately $5,000 in anticipation of unspecified taxes and expenses associated with LGP's wind-down. He also reimbursed


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 6 of 22

himself for “loans”[6] he had made to cover LGP’s expenses and paid certain other of LGP’s debts.

While some of LGP’s proceeds from the sale of the Property were used to reduce the amount owed on the Rabobank LOC, they did not completely satisfy that obligation. In January 2016, Rabobank’s attorney sent an email to Messrs. Payne and LaRiviere in which he stated that he intended to commence litigation against them on January 28, 2016 and to pursue pre-judgment efforts to attach assets that could be used to satisfy their obligations under their respective guarantees. [Creditors’ Ex. 20.]

In response to this threat, Mr. Payne and Ms. Tremain filed a petition for relief under Chapter 13 on February 26, 2016. Mr. LaRiviere, however, entered into a settlement agreement with Rabobank, pursuant to which he assumed responsibility for repaying the entire guaranteed amount – more than $300,000. [Creditors’ Exs. 22 and 23.] Rabobank’s amended proof of claim reflects that Mr. LaRiviere has been making payments pursuant to his settlement, and that Mr. Payne’s liability to Rabobank is being reduced accordingly. [Creditors’ Ex. 15.]

As required by section 521, Mr. Payne and Ms. Tremain filed along with their petition schedules of their assets and liabilities, as well as a Statement of Financial Affairs and other documents. They did not, however, disclose in their

---

[6] According to Exhibit 31, these “loans” never existed in the formal sense. Rather, this appears to have been Mr. LaRiviere’s way of referring to the significant expenses he paid on LGP’s behalf.


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 7 of 22

schedules any debts to Mr. LaRiviere, to LGP, or to LG. Indeed, Mr. Payne admitted that he did not even notify Mr. LaRiviere that he had filed a bankruptcy case. Mr. LaRiviere claims to have learned of it only through Rabobank's counsel. [Creditors' Ex. 21.]

**C. Summary of Arguments**

According to LGP and Mr. LaRiviere, the joint debtors' failure to schedule debts to LGP, LG, and Mr. LaRiviere constituted a deliberate effort to avoid the debt limits of section 109(e), which limits eligibility for relief under Chapter 13 to joint debtors with less than $383,175 of noncontingent, liquidated, unsecured debts. LGP, LG, and Mr. LaRiviere also contend that Mr. Payne and Ms. Tremain misrepresented their past and present tax liability and their income. LGP, LG, and Mr. LaRiviere argue that, taken together, these deliberate omissions or misrepresentations prove that Mr. Payne and Ms. Tremain did not file their petition in good faith and justify entry of an order sustaining their Objection to confirmation of the proposed plan. .

LGP, LG, and Mr. LaRiviere also contend that confirmation should be denied because Mr. Payne and Ms. Tremain have not proposed their plan in good faith. Here, LGP, LG, and Mr. LaRiviere claim that Mr. Payne and Ms. Tremain fail to contribute all of their disposable income to their proposed plan payments, apparently because certain secured debts will be paid off during the course of the plan and the joint debtors fail to reallocate the money used for those payments toward what they propose to pay to unsecured creditors. They also


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 8 of 22

argue that Mr. Payne and Ms. Tremain have overstated their business expenses and overstated their monthly income tax expenses, which artificially reduced the amount of disposable income devoted to paying unsecured creditors.

Mr. Payne and Ms. Tremain, of course, deny all of this. According to them, LGP had accumulated profits with which Mr. LaRiviere absconded, leaving LGP unable to pay its debts as they became due. Mr. Payne and Ms. Tremain also argue that they reasonably believed that LGP's share of the net proceeds from the sale of the Property should have been sufficient to pay all of LGP's debts; therefore, they contend that they also reasonably believed they did not owe anything to LGP, LG, and Mr. LaRiviere and did not include any debts to them in their schedules.

They further contend that Mr. LaRiviere kept them, and particularly Mr. Payne, "in the dark" about LGP's financial affairs, failing to tell them, for example, that Mr. Payne had drawn approximately $80,000 on the Rabobank LOC and used those funds to start LG, his new firm, or that LGP had unpaid credit card debt. And, even if they had liability to LGP, LG, or Mr. LaRiviere, Mr. Payne and Ms. Tremain assert that their liability is limited to the extent of Mr. Payne's interest in LGP, or 45%. The joint debtors' trial brief does not respond to LGP's and Mr. LaRiviere's arguments concerning their alleged misrepresentations of their income and expenses.

**D. Conclusions of Law**

Section 1325 governs confirmation of plans in cases pending under Chapter 13 of the Bankruptcy Code and requires

the court to confirm a plan if, among other things, "[it] has been proposed in good faith and not by any means forbidden by law" (11 U.S.C. § 1325(a)(3)) and if "the action of the debtor in filing the petition was in good faith" (11 U.S.C. § 1325(a)(7)). The good faith requirements of sections 1325(a)(3) and (a)(7) are closely related and are frequently based on the same factors. In re Lavilla, 425 B.R. 572, 577 (Bankr. E.D. Cal. 2010).

When seeking confirmation of a plan, the debtor, as plan proponent, has the burden of proving that the case and the plan were filed in good faith. Ellsworth v. Lifescape Med. Assoc. P.C. (In re Ellsworth), 455 B.R. 904, 918 (B.A.P. 9th Cir. 2011). A debtor satisfies this burden with a preponderance of the evidence. U.S. ex rel Farmers Home Admin. V. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 655 (B.A.P. 9th Cir. 1994).

The Bankruptcy Code does not define "good faith." The Ninth Circuit has held that "the proper inquiry is whether the [debtors] acted equitably." Goeb v. Heid (In re Goeb), 675 F.2d 1386, 1390 (9th Cir. 1982) (analyzing good faith under section 1325(a)(3)). In making that inquiry, the court applies a "totality of the circumstances" test, taking into account (1) whether the debtor misrepresented facts, unfairly manipulated the Bankruptcy Code or otherwise proposed the plan in an inequitable manner; (2) the history of the debtor's filings and dismissals; (3) whether the debtor intended only to defeat state court litigation; and (4) whether the debtor's behavior was egregious. Leavitt v. Soto (In re Leavitt), 171 F.3d 1219,


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 10 of 22

1224 (9th Cir. 1999). The court can determine that a plan or petition were not filed in good faith without having to find that the debtor acted in bad faith, i.e., acted with dishonesty of belief or purpose. Guastella v. Hampton (In re Guastella), 341 B.R. 908, 920 (B.A.P. 9th Cir. 2006) (bankruptcy schedules that bore no relationship to reality in the estimation of a judgment creditor's claim supported a finding that the petition was not filed in good faith).

**a. Good Faith in Filing the Petition**

Mr. LaRiviere and Mr. Payne launched LGP on August 1, 1994; they were partners in the practice of law for more than twenty years. [Debtors' Ex. A.] Despite this long business relationship, Mr. Payne would have the court believe that he knew next to nothing about LGP's profits and losses, what it would take to wind down a law firm in which he had been a partner for more than two decades, and that he had no idea that Mr. LaRiviere was incurring extraordinary personal expenses to avoid disastrous financial consequences for himself and Mr. Payne. The court cannot accept Mr. Payne's version of the story, for several reasons.

First, the court does not believe that Mr. Payne could have been a partner in what was essentially a two-person partnership for more than twenty years without absorbing some knowledge of the firm's financial picture, including what its ordinary course income and expenses were, what its revenues were, etc. In order for the court to accept Mr. Payne's claim that he reasonably believed he owed nothing to LGP, LG, and/or Mr. LaRiviere, the court also would be required to accept that



Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 11 of 22

Mr. Payne learned nothing in 20 years about the business in which he was a partner. The court cannot accept either premise, because they make no sense and because Mr. LaRiviere's testimony proves them untrue.

Mr. LaRiviere testified that, periodically throughout LGP's existence, he, Mr. Payne, their office manager, and their accounting manager would meet to discuss attorney workload, payables, receivables, etc. Mr. LaRiviere testified specifically about one such meeting that took place just prior to Mr. Payne's departure. At that point, LGP was in a "bunch of trouble." "We were not collecting enough to cover our payables, and I was contributing enough money at that point in time to make payroll." Mr. LaRiviere also testified that, at the same time, he was not taking a salary because LGP could not afford to pay him.

Mr. Payne did not dispute Mr. LaRiviere's testimony about these meetings generally, or that one such meeting took place just prior to his departure. This unrefuted evidence renders false Mr. Payne's claim to have been ignorant of LGP's financial picture.

In addition, the written agreements governing the partnership rendered each partner personally liable for the firm's debts to the extent those obligations exceeded the firm's assets. Given that he knew of LGP's precarious financial condition, these provisions should have prompted Mr. Payne to at least investigate the extent of LGP's assets for the purpose of determining whether he might have liability for the firm's debts, whether to third party creditors or to Mr.


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 12 of 22

LaRiviere, whom Mr. Payne knew was paying LGP's wind-down expenses.

LGP's Articles of Incorporation required the firm to indemnify a partner for "payments made and liabilities reasonably incurred in the ordinary and proper conduct of [LGP's] business or property" or for "payments made or liabilities incurred for the preservation of the Firm's business or property." [Debtors' Ex. A, § 6.4 (as amended June 12, 2006).] Where any such payment or liability exceeded $1,000, however, the partner making the payment or incurring the liability on the firm's behalf was required to obtain the prior consent of the other partners, except to the "extent such expenditures have been borne by the firm in the ordinary course of business." [Id.] This provision is significant because it expresses Mr. Payne's agreement that, to the extent Mr. LaRiviere was paying LGP's expenses out of his own pocket, Mr. LaRiviere might have been entitled to look to LGP for indemnification.

LGP's Articles of Incorporation also stated:

> No withdrawing partner shall be relieved of his or her liability to third parties by reason of withdrawal from the Firm except to the extent of Firm assets. In the event of a dissolution of the Firm, each then partner or former partner shall remain liable for obligations of the Firm incurred while such person was a partner in the Firm to the extent that the assets of the Firm are insufficient to satisfy such obligation. All partners, whether general or restricted, shall be individually liable in proportion to the balance in their capital accounts."

[Id., § 7.2.] This provision makes clear that, even after his withdrawal from LGP, Mr. Payne remained on the hook for the


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 13 of 22

firm’s liabilities to the extent its assets were insufficient to cover them.

As to the extent of LGP’s assets, Mr. Payne makes two arguments. First, he claims that LGP’s revenues should have been sufficient to cover its expenses (other than the Rabobank LOC), even going so far as to claim in Debtors’ Trial Brief that LGP had accrued profits with which Mr. LaRiviere wrongfully absconded. Second, he claims that, even if his first argument is incorrect, LGP’s share of the net proceeds from the sale of the Property should have been sufficient to cover all of LGP’s debts, except for the Rabobank LOC. The first of Mr. Payne’s arguments lacks credibility and frankly, any basis in reality. The second constitutes an admission that, at the time he and Ms. Tremain sought relief in this court, Mr. Payne knew or had reason to know that he might owe money to Mr. LaRiviere, given that Mr. LaRiviere was making payments on the guaranteed obligation to Rabobank and reducing Mr. Payne’s liability thereon.

Mr. LaRiviere consistently and credibly testified that LGP was in terrible financial condition at the time Mr. Payne left the firm. It did not generate revenue sufficient to make payroll, which Mr. LaRiviere paid from his own pocket. It could not afford to pay salaries to its partners. And while LGP certainly had receivables to collect, the only evidence the court received led to the unequivocal conclusion that, even if LGP succeeded in collecting every cent owed, they would not suffice to pay all of LGP’s outstanding debts. Given Mr.


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 14 of 22

Payne’s proven knowledge of LGP’s financial condition, he cannot credibly claim that LGP was profitable.

Nevertheless, that is exactly the story Debtors’ Trial Brief attempts to tell. It argues in at least two places that LGP had “accrued profits” of more than $65,000, with which Mr. LaRiviere allegedly absconded. [Debtors’ Trial Brief, 3:16-17; 4:6-7.] As proof, Mr. Payne points to Exhibit 31 and its reference to a “distribution” to Mr. LaRiviere in the amount of $65,102. Exhibit 31 does indicate that Mr. LaRiviere received $65,102, but it goes on to state that all cash was accounted for on Mr. LaRiviere’s “side of the ledger” because he was contributing funds out of pocket to manage LGP’s affairs, while Mr. Payne contributed nothing. Exhibit 31 does not prove LGP had any profits at any time.

Moreover, Mr. Payne’s testimony contradicted the arguments in Debtors’ Trial Brief. He testified that LGP was “suffering massive losses,” which completely undermines any allegation that LGP had accrued profits.

Next, Mr. Payne and Ms. Tremain contend that LGP’s share of the net proceeds from the sale of the Property should have been enough to pay all of its debts, other than the Rabobank LOC. This is a startling admission. Clearly, Mr. Payne knew that he remained obligated to Rabobank on account of his guaranty – he and Ms. Tremain included a debt to Rabobank in their Schedule F.

Mr. Payne cannot credibly claim not to have known that Mr. LaRiviere was making payments to Rabobank on account of his own guaranty. And indeed, Mr. Payne does not specifically make


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 15 of 22

such a claim. All he suggests is that Mr. LaRiviere kept him "in the dark" about financial issues. This is flatly untrue, as proven by the uncontroverted testimony detailing meetings concerning LGP's financial affairs, the correspondence from Mr. LaRiviere to Mr. Payne requesting assistance in covering expenses, etc. But the one thing Mr. Payne never claimed to have done was ask Mr. LaRiviere whether he thought Mr. Payne owed him money prior to filing bankruptcy. Such a simple question, but one that neither Mr. Payne nor Ms. Tremain appears to have asked.

And even if it is true that Mr. LaRiviere did not reach out to Mr. Payne to keep him fully advised as to who owed what to whom, once Mr. Payne and Ms. Tremain decided to seek relief in this court, they had an obligation to conduct a reasonable investigation into their assets and liabilities and to be as accurate and as truthful as possible in disclosing that information to the court, to their creditors, and to other parties in interest before attesting to the accuracy of that information *under penalty of perjury*. Cusano v. Klein, 264 F.3d 936, 946 (9th Cir. 2001). As the preeminent bankruptcy treatise points out: "The fact that the debtor does not have complete knowledge of his or her own affairs will not excuse the omission of creditors from the schedules." 4 Collier on Bankruptcy, ¶ 521.06[2][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Mr. Payne and Ms. Tremain went to great lengths during trial to attack each component of the claims filed by LGP, LG, and Mr. LaRiviere, in an apparent attempt to prove that they


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 16 of 22

owed them nothing and that their schedules were filed in good faith. What they unfailingly admit, however, is continued liability on account of the Rabobank guaranty. Even if all other components of LGP's, LG's, and Mr. LaRiviere's claims fall away, the liability on the Rabobank guaranty exists. And with that liability comes Mr. LaRiviere's right to seek contribution from Mr. Payne for payments Mr. LaRiviere made on account of that guaranteed obligation.

Long-settled California law gives a co-guarantor who pays a guaranteed obligation a right to seek contribution from other co-guarantors. Cal. Civ. Code § 2848; Overholser v. Glynn, 267 Cal. App. 2d 800, 807 (1968) (a guarantor that paid more than its fair share may sue co-guarantors to obtain contribution); Am. Int'l Specialty Lines Ins. Co. v. Cont'l Cas. Ins. Co., 142 Cal. App. 4th 1342, 1364 (2006) (same). Given the joint debtors' admission that Mr. Payne's liability as a guarantor of the Rabobank LOC persisted, given the lack of any credible claim not to have known that Mr. LaRiviere was making payments on his own guaranty of that obligation, Mr. Payne knew or should have known he might owe something to Mr. LaRiviere, and he and Ms. Tremain should have disclosed such a debt in their schedules. At the very least, they should have asked the question.

Mr. Payne and Ms. Tremain failed to engage in reasonable efforts to determine the nature and extent of any liability one or both of them might have had on account of obligations arising from Mr. Payne's interest in LGP. This constitutes the kind of inequitable and egregious conduct that justifies the


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 17 of 22

conclusion that they did not file their petition in good faith as required by section 1325(a)(7).[7]

This result might seem unfair as to Ms. Tremain, who was not a partner in LGP. This was, however, a joint petition and in filing it, Ms. Tremain assumed the same obligation as Mr. Payne to do her level best to ensure the completeness and accuracy of their schedules. Beyond her signature, which verified the joint petition, schedules, and other required documents under penalty of perjury, the court received no evidence whatsoever relevant to the issue of Ms. Tremain's good faith, which was clearly implicated by LGP's and Mr. LaRiviere's Objection. Ms. Tremain never even took the stand. The Debtors bore the burden of proof on the issue of good faith, and they failed to sustain it.

The court declines to find, however, that Mr. Payne and Ms. Tremain omitted obligations to LGP, LG, and/or Mr. LaRiviere for the purpose of ensuring their eligibility for relief under Chapter 13. Ms. Tremain and Mr. Payne dispute most of the components of LGP's, LG's, and Mr. LaRiviere's claims and have raised these disputes by objecting to those claims. Without addressing those objections (which were not the subject of the trial), the court is unable to reach a conclusion as to the joint debtors' eligibility for relief under Chapter 13. And the court certainly did not receive evidence sufficient to prove that a desire to stay within

---

[7] Neither Mr. Payne nor Ms. Tremain have any prior bankruptcy cases, so this factor does not support a finding that they acted in bad faith in filing this case or in filing their plan.

section 109(e)'s debt limits caused the joint debtors to omit LG, LGP, and/or Mr. LaRiviere from their schedules.

LGP and Mr. LaRiviere next argue that Ms. Tremain and Mr. Payne filed this case for the sole purpose of defeating state court litigation commenced by Rabobank. The court received no evidence whatsoever as to whether this motivated Ms. Tremain to file for bankruptcy. As previously mentioned, she did not take the stand to explain, let alone prove, her good faith. That said, she appears to have had no personal liability on account of the Rabobank guaranty beyond that creditor's ability, if any, to pursue community property for repayment. Mr. Payne, however, testified candidly and credibly that, while Rabobank's collection efforts pushed him and Ms. Tremain over the brink, they had other debt to reorganize. For this reason, the court declines to find that the joint debtors were motivated solely by an effort to defeat Rabobank's state court litigation such that they filed their bankruptcy petition in bad faith.

Finally, LGP and Mr. LaRiviere assert that Ms. Tremain and Mr. Payne misrepresented their past and present tax liability and income and that this further justifies a finding that they did not file their petition in good faith. The court does not agree.

As to his tax liability, Mr. Payne credibly testified that he consulted with his accountant and counsel in calculating his monthly expenses for estimated tax payments. While his calculation might have been high for 2015, that did not result from any effort to affirmatively misrepresent that expense in order to keep money away from creditors or from (as with


Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 19 of 22

obligations to LGP, LG, and/or Mr. LaRiviere) an utter failure to attempt to ascertain what that liability might be. And as for 2016, Mr. Payne credibly testified that the monthly expense might be too low.

As for his business expenses, Mr. Payne explained that originally his and Ms. Tremain's schedules claimed income and expenses from LGP – an obvious error, given that Mr. Payne left LGP in 2014, approximately a year-and-a-half prior to the commencement of their bankruptcy case. Mr. Payne attributes that error to his bankruptcy counsel, who readily admitted his mistake during trial. Mr. Payne and Ms. Tremain amended their schedules to correct that error in November 2016. While sloppy, this error does not prove that the joint debtors did not file their petition in good faith.

**b. Good Faith in Filing the Plan**

Mr. LaRiviere and LGP argue that Ms. Tremain's and Mr. Payne's alleged misrepresentations in their schedules concerning their past and present tax liability and business income and expenses also justify denial of confirmation under section 1325(a)(3). The court rejects that argument here, just as firmly as it did when advanced in support of denial of confirmation under section 1325(a)(7).

The court also overrules LGP's and Mr. LaRiviere's argument that a lack of good faith is proven by the joint debtors' failure to reallocate to unsecured creditors money devoted in the first several months of the plan to payments on secured claims, where those claims will be paid in full during the plan's term. While this argument might have been well-

taken when initially raised, it now appears moot. On December 15, 2016, Mr. Payne and Ms. Tremain filed a second amended plan {Dkt. 56] that reallocates to unsecured creditors most of the money devoted to secured claims that will be paid in full during the term of their plan. [See also Dkt. 47.] Accordingly, the court overrules the Objection as moot on this issue.

**E. Conclusion**

The court sustains the Objection under section 1325(a)(7) for the reasons stated herein. The court overrules the Objection under section 1325(a)(3).

****END OF ORDER****



Case: 16-50543 Doc# 102 Filed: 12/29/17 Entered: 12/29/17 14:18:43 Page 21 of 22

**Court Service List**

[None]